USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/25/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

:

RAMFIS AQUINO,                                         :

:

Plaintiff,      :

:                       1:16-cv-1577-GHW

:

-against-                  :

:                       MEMORANDUM OPINION

CITY OF NEW YORK, *et al.*                      :                       AND ORDER

:

Defendants.   :

:

------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

In March 2013, Plaintiff Ramfis Aquino was taken into custody for violating the conditions

of his parole.  Plaintiff alleges that while being processed at the Bronx Central Booking facility,

certain employees of the New York City Department of Correction ("DOC") subjected him to the

use of excessive force when they struck him in the head and back without provocation, resulting in

permanent hearing loss.  The City of New York (the "City") has moved to dismiss Plaintiff's claim

for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  For the

reasons that follow, the City's motion is GRANTED and Plaintiff's *Monell* claim is dismissed.

## I.    BACKGROUND[1]

On March 28, 2013, Plaintiff was taken into custody for allegedly violating the conditions of

his parole.  Amended Complaint, Dkt. No. 27 ("Compl."), ¶ 14.  He was brought to Bronx Central

Brooking.  *Id.* ¶ 15.  While at Bronx Central Booking, but before seeing a judge, Captain Francisco

Medina, Correction Officer Anthony Robinson, "and other corrections officers arrived, removed

---

[1] At the motion to dismiss stage, the allegations in the complaint are accepted as true and all reasonable inferences are drawn in Plaintiff's favor.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[Plaintiff] from the holding cell, cuffed him, and escorted [him] downstairs to be strip searched." *Id.* ¶ 16.  En route, Captain Medina "encouraged the other officers to use force" against Plaintiff.  *Id.* ¶ 17.

The officer-defendants were present for a strip search of Plaintiff, during which Plaintiff "removed his clothes and squatted as directed by the officer defendants" and after which he "stood up and looked around." *Id.* ¶¶ 18-19.  Plaintiff "did not resist or disobey any orders from the officer-defendants." *Id.* ¶ 23.

Correction Officer Robinson "aggressively asked [Plaintiff], in sum and substance, why he was looking at their badges." *Id.* ¶ 20.  Thereafter, "in the immediate presence of the other officers, C.O. Robinson and C.O. Cruz punched, smacked, and/or otherwise struck [Plaintiff] in the back of the head." *Id.* ¶ 21.  This caused "a sharp pain in or near [Plaintiff's] left ear and an alteration in his ability to hear out of that ear." *Id.* ¶ 22.  Plaintiff was taken to another cell and "repeatedly requested medical attention," but those requests were denied.  *Id.* ¶ 24.

Upon seeing the judge, Plaintiff was remanded to DOC custody.  *Id.* ¶ 25.  He "reported the injuries and the assault to DOC officials at intake in the Vernon C. Bain Center." *Id.* ¶ 26.  Over the next few days, Plaintiff's "left ear began discharging a foul-smelling pus-like substance" and an audiologist concluded that he had suffered hearing loss. *Id.* ¶¶ 27-28.  Plaintiff was thereafter given a hearing aid for his left ear, but due to an imbalance caused by impaired hearing in the left ear, he was also issued a hearing aid for his right ear.  *Id.* ¶¶ 29-30.

Plaintiff alleges that at the time of the incident at issue here, "there was a pattern and practice of conduct by DOC officials that violated the constitutional rights of inmates." *Id.* ¶ 34. Plaintiff's municipal liability claim relies exclusively on facts drawn from two government reports concerning issues at the DOC, both of which he has incorporated by reference into the complaint. *See* Compl. ¶ 34 n.1, 2.  The first report upon which Plaintiff relies was issued by the United States

Attorney for the Southern District of New York on August 4, 2014.  *See* CRIPA Investigation of the New York City Department of Corrections Jails on Rikers Island (the "DOJ Report") (annexed as Ex. C to Declaration of Jeffrey Loperfido (Dkt. No. 52) ("Loperfido Decl.")).  The DOJ Report contains the conclusions of an investigation into "the treatment of adolescent male inmates, between the ages of 16 and 18, at New York City Department of Correction . . . jails on Rikers Island."  DOJ Report at 1.  The report concluded that "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates."  *Id.* at 3.  The DOJ Report also stated that its focus on the adolescent population "should not be interpreted as an exoneration of DOC practices in the jails housing adult inmates" and that the DOJ's "investigation suggests that the systemic deficiencies identified in th[e] report *may* exist in equal measures at the other jails on Rikers."  *Id.* (emphasis added).

The second report upon which Plaintiff relies was issued approximately six months later, in January 2015, by the New York City Department of Investigation.  *See* New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers (the "DOI Report") (annexed as Ex. D to Loperfido Decl.).  The DOI Report was issued after an investigation into "systemic illegal conduct at the Department of Correction . . . Rikers Island Facility" and focused on recruitment and screening of DOC correction officers.  DOI Report at 1, 3.  The report concluded that the DOC had "fail[ed] to recruit and hire consistently excellent staff at the Correction Officer (CO) level" and that the "DOC's hiring process has failed to recruit sufficient talented COs and has failed, in some instances, to weed out those who would abuse their position."  *Id.* at 1.

According to the complaint, "[t]here was, and is, a 'deep-seated culture of violence' which was 'pervasive' across the various DOC facilities, and 'DOC staff routinely utilize[d] force not as a last resort, but instead as a means to control the [] population and punish disorderly or disrespectful

3

behavior.'" *Id.* (quoting the DOJ Report at 3).  There was a "pattern and practice of 'correction officers resort[ing] to "headshots," or blows to an inmate's head or facial area too quickly.'" *Id.* ¶ 35 (quoting the DOJ Report at 4).  The complaint also alleges that at all relevant times, "there was a pattern and practice of using force as punishment or retribution" and a "pattern or practice of using force in response to inmates' verbal altercations with officers." *Id.* ¶¶ 36-37.  According to the complaint, these "*de facto* policies, practices, customs and usages were a direct and proximate cause of the unconstitutional conduct alleged" in the complaint. *Id.* ¶¶ 38 (quoting the DOJ Report at 4) (internal quotation marks omitted).

The complaint also alleges that, at all relevant times, the City "failed to properly train, screen, supervise, or discipline its employees including the officer-defendants, and failed to inform supervisors of their need to train, screen, supervise or discipline DOC employees such as the officer-defendants regarding the limits on use of force." *Id.* ¶ 39.  The complaint further alleges that the "DOC's hiring process has failed to recruit sufficient talented [corrections officers] and has failed, in some instances, to weed out those who would abuse their position." *Id.* ¶ 40 (quoting the DOI Report) (internal quotation marks omitted).  The complaint alleges that the "failure to properly hire, train, screen, supervise, or discipline, were direct and proximate causes of the unconstitutional conduct alleged" in the complaint. *Id.* ¶ 41.

Plaintiff filed his complaint on March 1, 2016, Dkt. No. 1, and an amended complaint on March 28, 2016, Dkt. No. 27.  On July 28, 2016, the City filed a motion to dismiss Plaintiff's municipal liability claim.  Dkt. No. 51.  Plaintiff opposed the City's motion on August 18, 2016, Dkt. No. 54, and the City replied on August 25, 2016, Dkt. No. 56.

## II.   STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  Legal conclusions, unlike facts, are not entitled to an assumption of truth.  *Iqbal*, 556 U.S. at 679.  A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).  In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint," "documents appended to the complaint or incorporated in the complaint by reference," and "matters of which judicial notice may be taken."  *Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016).

## III.   DISCUSSION

A municipality is not vicariously liable for its employees' actions under 42 U.S.C. § 1983.  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 691).  Municipalities are, however, liable for "their own illegal acts." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).  Plaintiffs seeking to hold a municipality liable under § 1983 must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 425 (S.D.N.Y. 2013) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

A plaintiff may satisfy the "policy or custom" prong in one of four ways:  by alleging the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by

final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact."  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996). Plaintiff's theories of *Monell* liability fall into the third and fourth categories.  He alleges a "custom or usage" of improper use of excessive force against inmates, a failure to properly screen prospective DOC correction officers, and a failure to train those officers regarding the use of force that amounts to "deliberate indifference" to the rights of inmates.

As discussed above, Plaintiff's municipal liability claim relies exclusively on facts drawn from the DOJ Report and the DOI Report.  Accordingly, the ability of Plaintiff's *Monell* claim to withstand the City's motion to dismiss is dependent on whether the facts contained in those reports support a plausible inference that an unconstitutional policy or custom of the City caused the alleged deprivation of Plaintiff's constitutional rights.

### A.  "Custom or Usage"

Plaintiff's first theory of municipal liability is that, at the time of the incident underlying the complaint, there was a "pattern and practice of 'correction officers resort[ing] to "headshots," or blows to an inmate's head or facial area too quickly,'" a "pattern and practice of using force as punishment or retribution," and a "pattern or practice of using force in response to inmates' verbal altercations with officers," and that these "*de facto* policies, practices, customs and usages were a direct and proximate cause of the unconstitutional conduct alleged" in the complaint.  Compl. ¶¶ 35-38.

A plaintiff need not point to an official rule or regulation in order to establish municipal

liability on the basis of the existence of an unconstitutional "custom or usage." Rather, "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). "So long as the discriminatory practices of city officials are persistent and widespread, they could be so permanent and well settled as to constitute a 'custom or usage' with the force of law, and thereby generate municipal liability." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (citation and internal quotation marks omitted).

Plaintiff has not plausibly alleged the existence of a "custom or usage" pursuant to which DOC officials resorted to "headshots" too quickly, used force as punishment or retribution, or used force in response to inmates' verbal altercations with officers, which caused a violation of his constitutional rights. Plaintiff relies entirely on the DOJ Report in support of this theory of municipal liability, but the conclusions of that report do not adequately support the claim in this case. The DOJ Report was limited to an examination of the "treatment of adolescent inmates, between the ages of 16 and 18,[2] at New York City Department of Corrections . . . jails on Rikers Island." DOJ Report at 1. As is apparent on the face of the complaint, however, the incident underlying this lawsuit did not take place on Rikers Island; rather, it took place at the Bronx Central Booking facility. And Plaintiff has not alleged facts supporting a plausible inference that the DOJ Report's conclusions—which exclusively concerned conduct on Rikers Island—can be fairly extended to conduct at the Bronx Central Booking facility. Simply put, even assuming that the DOJ

---

[2] The Court notes that several courts in this district have rejected the argument that, because the DOJ Report's conclusions are restricted to adolescent inmates, its conclusions could not serve as the basis for a *Monell* claim by an adult inmate. *See Poulos v. City of New York*, No. 14-cv-3023 (LTS) (HBP), 2015 WL 5707496, at *4 (S.D.N.Y. Sept. 29, 2015) ("[T]he content of the DOJ Report provides support for inferences that a policy of using excessive force against inmates on Rikers Island exists . . . ."); *White v. City of New York*, No. 13-cv-7421 (KPF), 2015 WL 4601121, at *7 (S.D.N.Y. July 31, 2015) ("Although the . . . DOJ's investigation was conducted within certain age parameters, the Court is not convinced that the distinctions make a difference."). The Court does not address this question, as it is unnecessary to a resolution of the City's motion to dismiss.

Report's findings reflect the existence of a "custom or usage" of DOC officials using excessive force on Rikers Island, those conclusions have limited, if any, application to facilities beyond Rikers Island.  And Plaintiff offers no basis to infer that the conclusions of the DOJ Report ought to apply more widely than the facilities to which the DOJ Report is explicitly restricted.  As a result, it is not plausible to infer that any "custom or usage" in existence at DOC facilities on Rikers Island caused Plaintiff's injury in the Bronx.

Plaintiff attempts to find support in the case of *Edwards v. City of New York*, No. 14-cv-10058 (KBF), 2015 WL 5052637 (S.D.N.Y. Aug. 27, 2015), in which the plaintiff survived a Rule 12(b)(6) motion to dismiss his *Monell* claim stemming from an alleged beating at the Bronx County Criminal Court while in DOC custody.  In *Edwards*, the plaintiff supported his claim of municipal liability with citations to a "litany of sources," including the DOJ Report, DOC Commissioner Joseph Ponte's June 2014 testimony before the New York City Council, "news articles documenting the use of excessive force by DOC officers," and "numerous civil lawsuits in which individuals alleged that DOC officers had applied excessive force against them."  *Id.* at *5.  That the plaintiff in *Edwards* survived a motion to dismiss does not help Plaintiff here, however, where in contrast to the "litany of sources" that were found sufficient to plausibly allege the existence of a municipal custom there, Plaintiff has chosen to rely solely on the DOJ Report in his complaint.  In fact, the court in *Edwards* explicitly stated:

> Even if these sources in isolation might not be sufficient to plausibly allege the existence of a municipal custom, collectively these allegations, taken as true, show the City's acute awareness of the pervasive use of excessive force by DOC officers.  When combined, these allegations render plausible plaintiff's claims under either a pattern and practice or failure to train/supervise theory.

*Id.*  As a result, *Edwards* does not save Plaintiff's claim.

### B.  Failure to Train/Failure to Screen

Plaintiff's second theory of municipal liability is that the City "fail[ed] to properly train,

screen, supervise, or discipline its employees including the officer-defendants, and failed to inform supervisors of their need to train, screen, supervise or discipline DOC employees such as the officer-defendants regarding the limits on use of force" and that the "failure to properly hire, train, screen, supervise, or discipline, were direct and proximate causes of the unconstitutional conduct alleged" in the complaint. *Id.* ¶¶ 39, 41. As an initial matter, this theory of municipal liability is not supported sufficiently by the conclusions of the DOJ Report for the reasons discussed above; namely, that Plaintiff was not in DOC custody on Rikers Island at the time of the incident. Additionally, although Plaintiff uses the words "hire," "train," "screen," "supervise," and "discipline" in asserting this theory of municipal liability, in light of Plaintiff's briefing, this aspect of Plaintiff's theory of municipal liability is most reasonably construed as asserting that the City failed to properly screen prospective correction officers, and that it failed to properly train those officers employed by the DOC.

Prior to analyzing these claims individually, the Court notes that "[w]here municipal liability is based on . . . inaction, rigorous standards of culpability and causation must be applied to ensure against vicarious liability." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 73 (2d Cir. 2014) (quoting *Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997) (internal quotation marks omitted)).

### 1. Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In order for municipal liability to attach on a failure to train theory, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citing *City of Canton*, 489 U.S. at 388). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate

deliberate indifference for purposes of failure to train." *Id.* at 62 (internal quotation marks and citation omitted).

To allege deliberate indifference in the context of a failure to train claim, a plaintiff must plead facts giving rise to a plausible inference that (1) the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) either the situation presents the employees with a difficult choice of the sort that training will make less difficult, or there is a history of employees mishandling the situation, and (3) the wrong choice by the employee will frequently cause a constitutional deprivation. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

Plaintiff has not plausibly alleged that a failure to train DOC officers regarding proper limits on the use of force caused his asserted constitutional injury, because he has not alleged that a deficiency in DOC correction officer training would frequently cause a constitutional deprivation of the sort alleged in the complaint, that being the use of excessive force against inmates. *See Brown*, 520 U.S. at 411 (requiring a showing that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."). Plaintiff has chosen solely to rely on the DOI Report for the factual predicate of this claim, but that report does not meaningfully discuss the use of excessive force and does not conclude that the deficiencies identified in the report would have an impact on the use of excessive force by correction officers against inmates. The DOI Report concluded that the DOC has "fail[ed] to recruit and hire consistently excellent staff at the Correction Officer (CO) level . . . ." DOI Report at 1. The report also asserts that the DOC has "failed, *in some instances*, to weed out those who would abuse their position." *Id.* (emphasis added). The consequences of those failures, the report finds, is that the DOC's hiring system "ha[s] contributed to the hiring of corrupt COs" because the DOC's vetting process has inadequately "screen[ed] for corruption vulnerabilities" such as "prior associations with inmates, gang affiliation, and prior arrests or misconduct indicative of poor moral character." *Id.* at

23.  Plaintiff's claim is that the City has failed to "train, screen, supervise or discipline the DOC

officials *to avoid the unconstitutional use of excessive force* against people in their care and custody."  Pl.

Mem. at 8.  However, the report does not draw a direct link between the DOC's hiring practices and

the use of excessive force.  To be sure, the report states that "COs must consistently ensure the

safety of inmates without resorting to excessive force."  DOI Report at 23.  But this does not

constitute a finding regarding any use of excessive force, and Plaintiff does not contend otherwise.

In sum, the factual predicate offered in support of this theory of municipal liability (the DOI

Report) does not support an inference regarding the existence of the "policy or custom" asserted by

Plaintiff (a failure to train officers regarding proper limits on the use of force).  As a result, the Court

cannot plausibly infer, on the basis of these facts alone, that the City was deliberately indifferent to

the risk that some flaw in its training would lead to the unconstitutional use of excessive force by

correction officers against inmates.

Plaintiff cites to *McLeod v. City of New York*, No. 14-cv-7904 (RMB), 2016 WL 3144052

(S.D.N.Y. Jan. 29, 2016) in opposition to the City's motion with respect to his failure to train theory.

The court in *McLeod* denied the City's motion to dismiss a *Monell* claim based upon a beating at the

Bronx Central Booking facility that was alleged to be "sufficiently brutal and egregious to warrant an

inference that it was attributable to inadequate training amounting to deliberate indifference by

officials in charge."  *Id.* at *3 (citing *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980) ("[A] single,

unusually brutal or egregious beating administered by a group of municipal employees may be

sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training

or supervision amounting to deliberate indifference or gross negligence on the part of officials in

charge.")) (additional citations omitted).  The court continued on to discuss the DOJ Report, and

stated that it "provides support for inferences that a policy of using excessive force against [adult]

inmates on Rikers Island exist[s] . . . which may in part be attributable to the City's failure to

adequately train DOC personnel." *Id.* (quoting *Poulos*, 2015 WL 5707496, at *5 ).  To the extent that the *McLeod* court's denial of the motion to dismiss was based on the conclusion that the DOJ Report supported the plaintiff's theory of municipal liability, this Court respectfully declines to follow that court's analysis.  The plaintiff in that case, like Plaintiff here, alleged that the beating took place at the Bronx Central Brooking facility and not on Rikers Island, and as has been discussed, Plaintiff has not articulated a basis on which to extend the conclusions of the DOJ Report to DOC facilities beyond Rikers Island.

### 2.  Failure to Screen

*Monell* claims based upon a failure to screen are analyzed somewhat differently than those based upon a failure to train.  However, as discussed above, the claims are similar insofar as both theories of municipal liability require a plaintiff to plead facts supporting a plausible inference of deliberate indifference to the rights of those with whom the municipal employees come into contact.

"To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Brown*, 520 U.S. at 410.  "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Id.* at 410-11.  Rather, "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* at 411.  A plaintiff must therefore plead that, based upon the allegedly inadequate screening, "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff" and the "connection between the background of the particular applicant and the

specific constitutional violation alleged must be strong." *Id.* at 412.  A "finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury." *Id.*

Here, Plaintiff has not adequately pleaded municipal liability based upon a failure to screen. First, while he has pleaded that certain officers used excessive force against him, and he has identified those officers by name in the complaint, Plaintiff has not pleaded any facts which would permit the plausible inference that the particular officers involved in the incident were hired by the City as a result of the screening flaws embodied in the DOI Report.  Under *Brown*, this pleading defect is fatal to Plaintiff's claim.

Even setting aside this defect, however, this theory of municipal liability still cannot withstand the City's motion to dismiss.  The DOI Report identifies deficiencies in the DOC's hiring practices, but the DOI Report did not conclude that as a result of the identified hiring deficiencies, correction officers are more likely to use excessive force against inmates.  And Plaintiff has not in any event plausibly alleged that those deficiencies in hiring identified in the report caused his asserted constitutional injury.  As noted, the report states that "COs must consistently ensure the safety of inmates without resorting to excessive force."  DOI Report at 23.  However, this single hortatory statement does not constitute a finding that any deficiencies in the DOC's hiring processes resulted in the hiring of correction officers who are more likely to use of excessive force against inmates.  Rather, as discussed, the DOI Report concluded that flaws in the hiring process "have contributed to the hiring of corrupt COs."  *Id.*  As a result, the complaint does not allow the Court to plausibly infer that deficiencies in the hiring of DOC correction officers caused a violation of Plaintiff's constitutional rights through the use of excessive force.  *See Brown*, 520 U.S. at 410 ("Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a 'but-for' sense:  But for the municipality's decision to hire the employee, the plaintiff would not have suffered

the injury.  To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.").

## C.  Leave to Amend

In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Accordingly, the Court grants Plaintiff leave to amend the complaint, solely with respect to his claim for municipal liability, to address the deficiencies identified in this opinion.  Any amended complaint must be filed no later than 30 days from the date of this order.

## IV.   CONCLUSION

For the reasons stated above, the City's motion to dismiss Plaintiff's *Monell* claim is granted, and Plaintiff's *Monell* claim is dismissed without prejudice to filing a second amended complaint no later than 30 days of the date of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 51.

SO ORDERED.

Dated:  January 25, 2017
       New York, New York

_____
GREGORY H. WOODS
United States District Judge

14